THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:08-CR-108-FL

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | **MEMORANDUM & RECOMMENDATION** |
| COREY JERMINE WHITNEY ) | |
| ) | |
| Defendant ) | |
| ) | |

This matter is before the court on Defendant Corey Jermine Whitney's Motion to Suppress. [DE-18]. The government has responded, [DE-19], and the court held an evidentiary hearing on December 5, 2008, to develop the record. At the December 5, 2008 hearing, the court heard testimony from Officer John Jeffrey Canady, a member of the Johnston County Sheriff's Department, who initiated the stop of Defendant, and Agent Jason Guseman, a member of the Johnston County Sheriff's Department who took photographs of the car that Defendant was driving when he was pulled over by the police. Accordingly, this matter is ripe for review.

## STATEMENT OF THE FACTS

The facts are not disputed. Officer Canady testified that on September 14, 2007, around 12:00 p.m., he was driving east on Highway 42 between Clayton and Wilson. His partner, Lieutenant Angela Bryan, was with him in the passenger seat of the car. Officer Canady noticed a black Cadillac Escalade being driven in the opposite direction, west on Highway 42. When Officer Canady looked in his side-view mirror as the Escalade passed

1

him, he could not see whether it had a license plate affixed to the back of the car. Accordingly, Officer Canady did a U-turn and followed the Escalade. When he got to within approximately one car length from the Escalade, Officer Canady saw that the car had a license plate, but a clear plastic covering over the license plate had made it difficult for him to see the license plate number.

Officer Canady called dispatch to verify the license plate number and he learned that the license plate number was registered to a 2001 Lexus, not a Cadillac Escalade. Accordingly, Officer Canady turned on his blue lights and siren, and pulled over Defendant. Defendant cooperated and immediately pulled over; the traffic stop took place on a rural stretch of highway.

Officer Canady was dressed in plain clothes. He got out of the car and approached Defendant's car. Officer Canady's gun was visible in his holster and he had his badge in his hand, as well as a badge around his neck. He identified himself as an officer and asked for Defendant's drivers license and car registration. Defendant gave Officer Canady his driver's license, and told Officer Canady that he did not have registration for the Escalade because his wife had recently purchased the car. Defendant did show Officer Canady the bill of sale for the Escalade from approximately one month earlier, which noted that the 2001 Lexus had been traded in order to purchase the Escalade. The bill of sale matched the Escalade and the documentation all seemed to be in order. Defendant explained that after his wife bought the car he switched the plates from the Lexus to the Escalade.

Officer Canady went back to his patrol car in order to determine whether Defendant's license was current and whether he had any outstanding warrants. After

2

calling dispatch, Officer Canady determined that Defendant's licence was valid and that he had no outstanding warrants. Officer Canady could not remember what Lieutenant Bryan was doing while he called in Defendant's license, although it is possible that she was talking to Defendant.

Officer Canady then again approached the Escalade. He gave back Defendant's license. At that point, because Defendant provided legitimate documentation regarding the Escalade purchase and had a valid license, Officer Canady concluded that Defendant had not violated any law with regard to the registration of the license plate.[1] However, he asked Defendant to step out of the vehicle because Officer Canady concluded that the license plate cover was improper and he wanted to show Defendant the cover and tell him to remove the cover when he got home. Officer Canady gave Defendant a verbal warning about the license plate cover.[2] It is Officer Canady's practice to ask the driver of a vehicle to look at a license place cover that Officer Canady believes does not comport with North

---

[1] Under North Carolina law, an owner of two vehicles can transfer the license plate from one vehicle to another, as long as the owner files the proper paperwork with the Department of Motor Vehicles and pays a transfer fee. N.C. Gen. Stat. § 20-64. In this case, Defendant did file the proper paperwork, although it had not been processed yet, which is why dispatch told Officer Canady that the license plate on the Escalade was registered to a 2001 Lexus.

[2] There is some question whether Defendant's license plate cover is illegal under North Carolina law. A North Carolina law allows the use of "transparent covers that are not designed or intended to prevent or interfere with the taking of a clear photograph of a registration plate by a traffic control system using cameras." N.C. Gen. Stat. § 20-63. Defendant's license plate cover was transparent, and government Exhibit 1, which is a photograph of Defendant's license plate with the cover, shows a clearly visible license plate. However, the cover may have been slightly tinted. Nonetheless, for purposes of this memorandum and recommendation, whether or not Defendant's license plate comported with North Carolina General Statute § 20-63, is not important. As discussed more fully below, it is the court's opinion that Officer Canady had a reasonable suspicion to effectuate the traffic stop.

3

Carolina law, and to ask the driver to remove the cover when the driver gets home. Usually, it takes about ten to fifteen minutes to process someone who has an improper license plate cover, and issue either a warning or a ticket.

While Officer Canady was showing Defendant the license plate cover, he asked Defendant if Defendant had any weapons on him. Defendant answered that he had no weapons. Officer Canady asked if he could search Defendant. Defendant answered that Officer Canady could search him. Officer Canady felt two bulges in Defendant's pockets and asked what was in them. Defendant answered that he had money in his pockets, approximately $3,000.

Officer Canady stated that he noticed Defendant seemed very nervous at this point. Defendant was breathing rapidly, his chest was rising and falling and the veins in Defendant's neck were slightly pulsating. Officer Bryan asked Defendant if he had narcotics or weapons in his Escalade. Defendant said that he did not have any contraband in his car. Bryan then asked if they could search Defendant's Escalade, but Defendant did not give Officer Bryan permission. Officer Bryan then called dispatch and requested a canine to come to the scene. It took approximately twenty minutes for the canine to arrive. The canine alerted on both the driver and passenger sides of the Escalade. Officer Canady then searched the vehicle. Inside the center console between the driver and passenger seats, he found a clear plastic bag of what looked like crack/cocaine, and another bag of what looked like marijuana. In addition, he found a loaded handgun, and a purple Crown Royal bag that looked to contain cocaine, scales, and a small amount of marijuana. Later testing of the substances confirmed that they were crack/cocaine and marijuana.

4

Defendant was arrested and read his Miranda rights. Officer Canady testified that Defendant called his wife while Officer Canady was transporting Defendant to jail and Defendant admitted to his wife that he was "dirty" when he was stopped. He also made a statement to police after arriving at the police station.

Agent Jason Guseman testified after Officer Canady. He is on a joint task force at the Johnston County Sheriff's Office and took pictures of Defendant's car. The picture that Agent Guseman took of Defendant's license plate shows clearly that license number and he took the photo on a sunny day. However, Agent Guseman noted that based on his experience, he finds it more difficult to see a license plate with a clear cover on a day that is not as sunny.

## DISCUSSION

Defendant is charged with (1) being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) & 924; (2) knowingly, intentionally and unlawfully possessing with intent to distribute more than five grams of cocaine base in violation of 21 U.S.C. § 841(a)(1); and (3) knowingly possessing a firearm in furtherance of a drug trafficking offense. His Motion to Suppress claims that the police did not have reasonable suspicion to detain him, after confirming that he had a valid license, that the bill of sale for the Escalade was proper and that the license plates were lawfully transferred from Defendant's wife's Lexus to the Escalade. Accordingly, Defendant contends that the evidence stemming from his detention and subsequent arrest should be suppressed.

A. <u>Traffic Stop Supported by Reasonable Suspicion</u>

Initially, the court must decide whether the police effectuated a stop sufficient to implicate the Fourth Amendment. Under the Fourth Amendment to the United States

5

Constitution, people shall "be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. . . ." U.S. Const., amd. IV. The purpose of the Fourth Amendment is to ensure that police and other government officials do not arbitrarily and oppressively interfere with a person's right to privacy. See INS v. Delgado, 466 U.S. 210, 215 (1984). The Supreme Court has established that under the Fourth Amendment, traffic stops are seizures. Delaware v. Prouse, 440 U.S. 648, 653 (1979). Accordingly, officers must have at least a reasonable suspicion of criminal misconduct before detaining a driver. Id.

In order to determine whether an officer had reasonable suspicion to conduct a stop, a court must consider the totality of the circumstances surrounding a seizure. United States v. Sprinkle, 106 F.3d 613, 618 (4th Cir. 1997). "Reasonable suspicion is a commonsensical proposition. Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the streets." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993).

Here, Officer Canady looked through his side-view mirror and could not tell whether Defendant's Escalade had a license plate due to his vantage point and the clear cover over the license plate. Because Officer Canady was unsure if the Escalade had proper tags, he decided to follow it. Once Officer Canady got close enough to the Escalade to see the license plate, he called the number into dispatch and learned that the license plate was registered to a 2001 Lexus and not a Cadillac Escalade. At this point, Officer Canady could reasonably have suspected that the plates or the Escalade were stolen, and therefore was justified in pulling Defendant over under the Fourth Amendment. Defendant

6

does not contest that Officer Canady had a reasonable suspicion to make the traffic stop.³ Accordingly, it is the court's opinion that the traffic stop was constitutionally permissible.

B. <u>Request to Search</u>

Defendant argues, however, that once Officer Canady confirmed that Defendant had a valid driver's license, that he lawfully possessed the Escalade, as indicated by the legitimate bill of sale, and that the license plate from the 2001 Lexus had been legitimately transferred to the Escalade, as indicated by the proper paperwork,⁴ that Officer Canady should have either issued a ticket or warning to Defendant and let him leave. Defendant asserts that Officer Canady's request to search Defendant and Lieutenant Bryan's request tp search Defendant's car exceeded the scope of the stop, and therefore runs afoul of the Fourth Amendment.

1. *The Seizure Had Ended*

The first issue for the court to determine is whether the stop had ended by the time Officer Canady asked Defendant if he could search Defendant's person and Lieutenant Bryan asked if they could search the Escalade. Generally, a "seizure" under the Fourth

---

³ In Defendant's Motion to Suppress, he argues that "The license tag cover did not create a reasonable and articulable suspicion of unlawful conduct in this case." Mot. To Supp. at 3. However, at the December 5, 2008 hearing, Defense counsel conceded that Officer Canady had a legitimate police interest in following Defendant when he thought Defendant did not have a license plate affixed to his Escalade, in calling in the license plate number when he got close enough to see it, and in pulling Defendant over when he learned that the license plate number was not registered to the Escalade.

⁴ Officer Canady stated that although sometimes people do not complete paperwork when transferring tags from one vehicle to another, Defendant had filed the proper paperwork and that he believed the change did not show up on his computer because Defendant's wife had only very recently purchased the Escalade.

7

Amendment occurs when, in light of the totality of the circumstances surrounding the stop, a reasonable person would not feel free to leave. United States v. Sullivan, 138 F.3d 126, 133 (4th Cir. 1998). "Circumstances where the citizen would feel free to go, but stays and has a dialogue with the officer, are considered consensual, and therefore do not implicate the Fourth Amendment." United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002). The fact that most people respond to police requests does not make an encounter non-consensual, even when the police do not tell individuals that they are free not to respond. INS v. Delgado, 466 U.S. 210, 216 (1984). A court may consider numerous factors in determining whether an individual would believe that he or she was free to leave, including, "the time, place, and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statements to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer, . . . the physical touching by the police of the citizen," and most importantly, the retention of a citizen's identification or other personal property by the police. Weaver, 282 F.3d at 310.

In this case, many of the above listed factors were not present. Officer Canady effectuated the traffic stop around noon on a public highway because the license plate cover made it difficult to read the license plate and the license plate was registered to a different car. Officer Canady requested Defendant's driver's license and registration. Defendant gave Officer Canady his license and showed him the bill of sale for the car, because he had not yet received registration for the Escalade from the Department of Motor Vehicles. Officer Canady took the license back to his vehicle to determine whether Defendant had outstanding warrants. When Officer Canady determined that Defendant's

8

license was in order, he returned it to Defendant. He then asked Defendant to get out of the Escalade and go to the back of the car so that he could show Defendant the cover over the license plate, which had made it difficult for Officer Canady to see the plate. Officer Canady's weapon was visible, in its holster. Lieutenant Bryan did not have a gun visible, as Officer Canady testified that she keeps her gun in a fanny pack around her waist. There is no indication that Officer Canady employed a threatening demeanor or touched Defendant before Defendant agreed to a pat-down search.

The Fourth Circuit, in a very similar case involving a traffic stop and questioning by police of the defendant, concluded that seizure of the defendant ended before the officer began to ask questions of the defendant. Sullivan, 138 F.3d at 133. In Sullivan, a police officer stopped a car because the car was missing a front license plate. The officer asked the driver for his license and registration, and asked if he had any outstanding parking tickets. The driver produced his license and registration and admitted that he thought he had one unpaid ticket. The officer took the license and ran it in a database; the driver's record was clean. The officer returned to the car, returned the license and registration, and told the driver to take care of the unpaid ticket and replace the missing license plate. The officer then asked the driver if he had anything illegal in the car. The driver evaded the question, and the officer asked the same question a few more times. Finally, the driver admitted that he had a gun in the car. In determining that the seizure of the defendant had ended by the time the police officer had asked him whether he had anything illegal in his car, the court noted that the officer "did not question [the defendant] until after he had returned [the defendant's] license and registration, thus ending the traffic stop and affording [the defendant] the right to depart." Id. The Fourth Circuit also noted that the

9

driver was in his car when the officer asked the questions and placed particular importance on the fact that there was no indication that the officer employed any physical force or engaged in any outward displays of authority that would indicate that he was detaining the driver.

The case at hand largely mirrors that in Sullivan, except that Defendant was outside his car when Officers Canady and Bryan asked Defendant whether they could pat him down and search his car. The court does not find the fact that Defendant was outside his car, while the driver in Sullivan was inside his car, significant enough to amount to a seizure in the latter but not the former.

In United States v. Lattimore, a police officer pulled over the defendant's car, and asked the defendant to accompany him to his patrol car. The officer issued the defendant a citation for failing to wear a seatbelt, and returned the defendant's driver's license to him. While the defendant was still in his vehicle, preparing to leave, the officer asked the defendant if he had narcotics or contraband in his vehicle and the defendant responded in the negative. The officer requested permission to search the vehicle, which the defendant gave, and the officer found cocaine in the car. The Fourth Circuit Court of Appeals held that the search was consensual. Accordingly, it is the court's opinion that the fact that Defendant was talking to Officer Canady outside of his vehicle does not alter the consensual nature of the interaction.

Officer Canady had returned Defendant's license to him, and had given him a verbal warning regarding the license plate cover, before asking permission to search Defendant. As in Sullivan, it is the court's opinion that based on the totality of the circumstances, the seizure had ended after Officer Canady returned the license and gave Defendant a verbal

10

warning; therefore Officer Canady's later request to search Defendant did not amount to a Fourth Amendment seizure. See also United States v. Lattimore, 87 F.3d 647, 653 (4th Cir. 1996) (en banc) (concluding that there was no Fourth Amendment violation when an officer performed a traffic stop, and asked a defendant whether he had any contraband in his car after issuing him two citations and returning his driver's license); United States v. Rusher, 966 F.2d 868 (4th Cir. 1992) (holding that a Fourth Amendment seizure had ended after an officer had effectuated a traffic stop, once the officer returned the defendant's license and told him he was "free to go").

While Officer Canady performed the search of Defendant, he felt two bulges in Defendant's pockets. Defendant explained that the bulges were money totaling approximately $3,000. At that point, Officer Canady knew that Defendant was extremely nervous and had approximately $3,000 in cash in his pockets. Lieutenant Bryan then asked Defendant if they could search Defendant's vehicle, and Defendant told them that they could not. At this point, Defendant was re-seized, as Lieutenant Bryan requested a canine unit and she and Officer Canady would not have allowed Defendant to leave prior to the arrival of the canine. See United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004) (noting that in order to perform a dog sniff of a vehicle, the vehicle must be seized, and therefore, the driver too, requiring either consent or reasonable suspicion of criminal activity to justify the detention).

### 2. *Search Did Not Exceed Scope of Stop*

Only if Defendant was still seized at the time of the questioning, will a court consider whether an officer exceeded the scope of a stop. Because a routine traffic stop amounts to a Fourth Amendment seizure, when the purpose justifying a stop is exceeded, the

11

detention becomes illegal unless a reasonable suspicion of some other crime exists. Sullivan, 138 F.3d at 131. However, when a stop is over and its purpose served, "mere questioning by officers, without some indicated restraint, does not amount . . . to a seizure under the Fourth Amendment." Id.

Here, Defendant argues that the seizure was ongoing. As a result, he claims that Officer Canady exceeded the scope of the stop when he asked to search Defendant. Defendant points to the fact that his license and paperwork for the Escalade were in order. In addition, Officer Canady testified that he did not notice anything suspicious about the Escalade when he walked up to it, and he could see in the windows of the car. Also, Officer Canady testified that he did not smell anything unusual when Defendant rolled down his window to talk to Officer Canady. Officer Canady did testify that when Defendant got out of his vehicle, he seemed nervous, was breathing heavily and veins in Defendant's neck were slightly pulsating. Defendant argues that Officer Canady had no reasonable suspicion of criminal conduct other than a possible violation of North Carolina law regarding license plate coverings. Defendant contends that his nervous behavior, without more, is not sufficient to establish the "additional reasonable suspicion" required when the purpose of the initial stop is exhausted.

However, the court does not believe that it needs to reach the question of whether nervous behavior, alone, is sufficient to establish "additional reasonable suspicion" because, as described above, it is the court's opinion that the first seizure of Defendant ended once Officer Canady returned his license and gave him a verbal warning. During the time when Defendant was no longer seized, Officer Canady learned that Defendant had $3,000 in his pocket.

12

Defendant was re-seized when he was required to wait for the canine unit to arrive. However, Officer Canady, at this stage in the proceedings, knew (1) that Defendant was nervous; he was breathing heavily and the veins in his neck were pulsating slightly, and (2) that Defendant had a large amount of cash in his pockets. The combination of these two factors gave Officer Canady reasonable suspicion that some other crime, beside a possible license plate cover violation, was afoot. Nervousness is one factor that can establish reasonable suspicion. See United States v. Foreman, 369 F.3d 776, 785 (4th Cir. 2004). (noting that a defendant's exceptional nervousness helped to establish that an officer had reasonable suspicion in requesting a drug dog sniff of the defendant's vehicle). In addition, large amounts of cash found on an individual can be considered evidence of drug activity. See United States v. Thomas, 913 F.2d 1111, 1115 (4th Cir. 1990) (noting that carrying large amounts of cash can help establish the link to drug activity). Accordingly, based on the totality of the circumstances, it is the court's opinion that Officer Canady had a reasonable, articulable suspicion of additional criminal activity to justify the brief, additional detention necessary to have a drug dog sniff Defendant's vehicle based on Defendant's nervous behavior and the large amount of cash that Defendant had in his pocket.

## CONCLUSION

For the reasons set forth above, the court **RECOMMENDS** that Defendant's Motion to Suppress be **DENIED**. The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the

proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This 22nd day of December 2008.

DAVID W. DANIEL
United States Magistrate Judge